**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ST. MARY'S REGIONAL MEDICAL CENTER
1808 W Main St.
Russellville, AR 72801

NORTH ALABAMA MEDICAL CENTER fka
ELIZA COFFEE MEMORIAL HOSPITAL
1701 Veterans Dr.
Florence, AL 35630

NORTH ALABAMA SHOALS HOSPITAL fka
SHOALS HOSPITAL
201 W Avalon Ave.
Muscle Shoals, AL 35661

CANYON VISTA MEDICAL CENTER fka
RCHP – SIERRA VISTA INC.
5700 E. Highway 90
Sierra Vista, AZ   85635

HAVASU REGIONAL MEDICAL CENTER                CASE NO:  1:26-cv-374
101 Civic Center Ln.
Lake Havasu City, AZ 86403

VALLEY VIEW MEDICAL CENTER fka PHC-
FORT MOHAVE INC.
5330 South Highway 95
Fort Mohave, AZ  86426

NATIONAL PARK MEDICAL CENTER
1910 Malvern Ave.
Hot Springs, AR 71901

SALINE MEMORIAL HOSPITAL
1 Medical Park Dr.
Benton, AR 72015

OTTUMWA REGIONAL MEDICAL CENTER
1001 E Pennsylvania Ave.
Ottumwa, IA 52501

MEADOWVIEW REGIONAL MEDICAL
CENTER
989 Medical Park Drive
Maysville, KY  41056

SPRING VIEW HOSPITAL LLC
320 Loretto Road
Lebanon, KY 40033

BOURBON COMMUNITY HOSPITAL
9 Linville Dr.
Paris, KY 40361

CLARK REGIONAL MEDICAL CENTER fka
KENTUCKY HOSPITAL LLC
175 Hospital Drive
Winchester, KY  40391

GEORGETOWN COMMUNITY HOSPITAL
LLC
1140 Lexington Road
Georgetown, KY  40324

JACKSON PURCHASE MEDICAL CENTER fka
PINELAKE REGIONAL HOSPITAL LLC
1099 Medical Center Circle
Mayfield, KY  42066

LAKE CUMBERLAND REGIONAL HOSPITAL
LLC
305 Langdon Street
Somerset, KY  42503

UP HEALTH SYSTEM MARQUETTE fka DLP
MARQUETTE GENERAL HOSPITAL LLC
850 W. Baraga Ave.
Marquette, MI  49855

UP HEALTH SYSTEM – PORTAGE fka
PORTAGE HOSPITAL LLC
500 Campus Drive
Hancock, MI  49930

COMMUNITY MEDICAL CENTER
2827 Fort Missoula Rd.
Missoula, MT 59804

2

NORTHEAST NEVADA REGIONAL
HOSPITAL fka PHC INC. – ELKO
2001 Errecart Blvd.
Elko, NV 89801

MEMORIAL MEDICAL CENTER fka PHC –
LAS CRUCES INC.
2450 South Telshor Blvd.
Las Cruces, NM  88011

LOS ALAMOS MEDICAL CENTER fka PHC –
LOS ALAMOS INC.
3917 West Road
Los Alamos, NM  87544

RUTHERFORD REGIONAL HEALTH SYSTEM
fka DLP RUTHERFORD REGIONAL HEALTH
288 S. Ridgecrest St.
Rutherfordton, NC  28139

HARRIS REGIONAL HOSPITAL fka
DLP HARRIS REGIONAL HOSPITAL LLC
68 Hospital Road
Sylva, NC  28779

CENTRAL CAROLINA HOSPITAL fka DLP
CENTRAL CAROLINA MEDICAL CENTER
1135 Carthage Street
Sanford, NC  27330

DLP FRYE REGIONAL MEDICAL CENTER
420 North Center Street
Hickory, NC  28601

DLP WILSON MEDICAL CENTER LLC
1705 Tarboro Street Southwest
Wilson, NC  27893

DLP MARIA PARHAM MEDICAL CENTER
LLC
566 Ruin Creek Road
Henderson, NC  27536

DLP PERSON MEMORIAL HOSPITAL INC.
LLC
615 Ridge Road
Roxboro, NC  27573

3

DLP HAYWOOD REGIONAL MEDICAL
CENTER LLC
262 Leroy George Drive
Clyde, NC  28721
WILLAMETTE VALLEY MEDICAL CENTER
2700 SE Stratus Ave.
McMinnville, OR  97128

CONEMAUGH NASON MEDICAL CENTER
fka NASON MEDICAL CENTER LLC
105 Nason Drive
Roaring Spring, PA 16673

CONEMAUGH MEMORIAL MEDICAL
CENTER fka DLP CONNEMAUGH
MEMORIAL MEDICAL CENTER LLC
1086 Franklin St.
Johnstown, PA  15905

SUMNER REGIONAL MEDICAL CENTER
LLC
555 Hartsville Pike
Gallatin, TN 37066

SOUTHERN TENNESSEE REGIONAL
HEALTH SYSTEM PULASKI fka HILLSIDE
HOSPITAL LLC
1265 East College Street
Pulaski, TN 38478

SOUTHERN TENNESSEE REGIONAL
HEALTH SYSTEM – WINCHESTER fka
SOUTHERN TENNESSEE MEDICAL CENTER
LLC
185 Hospital Road
Winchester, TN  37398

STARR REGIONAL MEDICAL CENTER –
ATHENS fka ATHENS REGIONAL MEDICAL
CENTER
1114 W. Madison Ave.
Athens, TN  37303

4

SOUTHERN TENNESSEE HEALTH SYSTEM
LAWRENCEBURG fka CROCKETT HOSPITAL
LLC
1607 S. Locust Ave.
Lawrenceburg, TN  38464

PARIS REGIONAL HEALTH fka PARIS
REGIONAL MEDICAL CENTER
865 Deshong Dr.
Paris, TX  75460

CASTLEVIEW HOSPITAL LLC
300 North Hospital Drive
Price, UT  84501

ASHLEY REGIONAL MEDICAL CENTER
150 West 100 North
Vernal, UT  84078

FAUQUIER HEALTH fka FAUQUIER
MEDICAL CENTER LLC
500 Hospital Drive
Warrenton, VA  20186

CLINCH VALLEY MEDICAL CENTER INC.
6801 Gov. G.C. Peery Hwy.
Richlands, VA  24641

SOVAH HEALTH – DANVILLE fka
DANVILLE REGIONAL MEDICAL CENTER
142 South Main Street
Danville, VA  24541

WYTHE COUNTY COMMUNITY HOSPITAL,
LLC
600 West Ridge Road
Wytheville, VA  24382

DLP TWIN COUNTY REGIONAL
HEALTHCARE LLC
200 Hospital Drive
Galax, VA  24333

TRIOS HEALTH
900 S. Auburn St.
Kennewick, WA  99336

RALEIGH GENERAL HOSPITAL LLC
1710 Harper Road
Beckley, WV  25801
SAINT FRANCIS MEDICAL CENTER
530 Northeast Glen Oak Avenue
Peoria, Illinois 61637

SAINT ANTHONY MEDICAL CENTER
5666 East State Street
Rockford, Illinois 61108

SAINT JAMES HOSPITAL
2500 West Reynolds Street
Pontiac, Illinois 61764

ST. JOSEPH MEDICAL CENTER
2200 East Washington Street
Bloomington, Illinois 61701

ST. MARY MEDICAL CENTER
3333 North Seminary Street
Galesburg, Illinois 61401

SAINT ELIZABETH MEDICAL CENTER
1100 East Norris Drive
Ottawa, Illinois 61350

SAINT ANTHONY'S HEALTH CENTER
1 Saint Anthony's Way
Alton, Illinois 62002

SACRED HEART MEDICAL CENTER
812 North Logan Avenue
Danville, Illinois 61832

HEART OF MARY MEDICAL CENTER
1400 West Park Street
Urbana, Illinois 61801

LITTLE COMPANY OF MARY MEDICAL
CENTER
2800 West 95th Street
Evergreen Park, Illinois 60805

OSF SAINT KATHARINE MEDICAL CENTER
403 East 1st Street
Dixon, Illinois 62021

       Plaintiffs,

v.

ROBERT F. KENNEDY, JR., Secretary
United States Department of Health and
Human Services
200 Independence Avenue, S.W.
Washington, D.C.  20201,

       Defendant.

## COMPLAINT

The above-captioned Plaintiff hospitals (collectively, the "Hospitals"), by and through their undersigned attorneys, bring this action against defendant Robert F. Kennedy, Jr., in his official capacity as the Secretary (the "Secretary") of the United States Department of Health and Human Services ("HHS"), and state as follows:

## INTRODUCTION

1. The Hospitals challenge their Medicare inpatient hospital payments for Federal Fiscal Years ("FFYs") 2025 and 2026 as being unlawfully understated because the Secretary calculated them using a "standardized amount" that was invalidly low because of an embedded error from the Secretary's original implementation of the Medicare Hospital Inpatient Prospective Payment System ("IPPS") in FFY 1984.

2. "Standardized amounts" are the fundamental methodological building block that the Secretary uses to calculate IPPS payments. The Medicare Act provisions implementing IPPS expressly required the Secretary to base his calculation of the original standardized amounts on the average "costs per discharge" from a base year. Instead of following this non-discretionary directive, the Secretary violated the statute and acted arbitrarily and capriciously by including

7

patient *transfers* in his "costs per discharge" calculation. This error caused an understatement of the original IPPS standardized amounts. Moreover, the Secretary's error was embedded into the IPPS standardized amounts going forward because the Secretary calculates the standardized amount for each FFY by starting with and updating the prior year's standardized amount. Although fully aware of his error in calculating the FFY 1984 standardized amounts, and the carry-forward effect of that error, the Secretary has refused to correct for that error in subsequent IPPS rulemakings setting the standardized amounts and resulting IPPS payment rates, including for FFYs 2025 and 2026.

3.       Many of these Hospitals have pursued this substantive issue by filing administrative appeals with the Provider Reimbursement Review Board ("PRRB" or "Board") dating back as far as 2005. Now, more than 20 years after the Hospitals began asserting these claims—and more than 40 years after the Secretary's original error—the Board has finally certified this issue for judicial review of the merits. As set forth below, the Hospitals request that the Court, *inter alia*, declare that the standardized amounts for FFY 2025 and FFY 2026 are lower than required by statute and order the Secretary to recalculate the Hospitals' IPPS payments for those FFYs to remove the embedded effect of his error in calculating the original FFY 1984 standardized amounts.

## JURISDICTION AND VENUE

4.       This action arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (the "Medicare Act"), the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "APA"), and other authorities.

5.       This Court has jurisdiction under 42 U.S.C. § 1395oo(a)(1)(A)(ii), 42 U.S.C. § 1395oo(f)(1), 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 28 U.S.C. § 1651.

6.       Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391(e).

**PARTIES**

7.      At all times relevant to this action, the Hospitals qualified as participating general acute-care hospital-providers under the Medicare program. The Hospitals are reimbursed under IPPS and paid according to the standardized amounts published by the Secretary in annual IPPS rulemakings. During the relevant periods under appeal, each of the Hospitals was owned by one of the following healthcare systems: LifePoint Health, Inc. d/b/a LifePoint Health; or OSF Healthcare System. The Hospitals with their Medicare provider numbers are set forth in the Schedules of Providers included in Exhibit 1 hereto. Some of the Hospitals have been known by various names over the years; they can be identified definitively by their Medicare provider numbers listed in Exhibit 1.

8.      Defendant Robert F. Kennedy, Jr., as Secretary of HHS, is the federal official responsible for administration of the Medicare program. The Secretary has delegated administrative responsibility over the Medicare program to the Centers for Medicare & Medicaid Services ("CMS").[1] The Secretary is sued in his official capacity only. References to the Secretary include his predecessors, successors, and subordinate agencies and officials.

**LEGAL AND REGULATORY BACKGROUND**

**A.      General Background of the Medicare Program**

9.      The Medicare Act establishes a system of health insurance for the aged, disabled, and individuals with end-stage renal disease. 42 U.S.C. § 1395 *et seq.* The Medicare program is federally funded and administered by the Secretary through CMS and its contractors. 42 U.S.C. § 1395kk; 42 Fed. Reg. 13,282 (Mar. 9, 1977). The Secretary, the federal official responsible for

---

[1] Before June 14, 2001, CMS was known as the Health Care Financing Administration. In this Complaint, the Hospitals refer to the agency as CMS even for events arising before June 14, 2001.

administering the Medicare program, has delegated that responsibility to CMS, an agency within HHS, and CMS's contractors. *Id.*

10.     The Medicare Act requires that "[n]o rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits [or] the payment for services . . . [under Medicare] shall take effect unless it is promulgated by the Secretary by regulation . . . ." 42 U.S.C. § 1395hh(a)(2). Thus, the Medicare Act prohibits the application of any rule or policy that establishes or changes a substantive legal standard governing the payment for service, unless it is promulgated by the Secretary through notice-and-comment rulemaking. In addition, the Medicare Act specifies that where a final rule "is not a logical outgrowth of a previously published notice of proposed rulemaking . . . , such provision shall be treated as a proposed regulation and shall not take effect." 42 U.S.C. § 1395hh(a)(4); *see also Azar v. Allina Health Services*, 587 U.S. 566 (2019).

11.     This case involves Part A of the Medicare program, which provides coverage and payment for, among other things, inpatient hospital services on a fee-for-service basis. 42 U.S.C. § 1395c *et seq.* Part A services are furnished to Medicare beneficiaries by "providers" of services—including the Hospitals—that have entered into written provider agreements with the Secretary, under 42 U.S.C. § 1395cc, to furnish inpatient and outpatient hospital services to Medicare beneficiaries. CMS pays providers participating in Part A of the Medicare program through Medicare Administrative Contractors ("MACs"), which are agents of the Secretary.

## B.     Implementation of IPPS

12.     Effective with the start of FFY 1984 on October 1, 1983, Congress significantly changed how Medicare pays acute care hospitals for inpatient hospital operating costs by enacting statutes requiring the Secretary to create and implement a Medicare hospital inpatient prospective payment system, commonly known as "IPPS."

10

13. Previously, Medicare reimbursed hospitals for the operating costs related to providing inpatient hospital services to Medicare beneficiaries based on their "reasonable costs" of delivering that care. In general, under the "reasonable cost" system, the more costs that a hospital incurred, the more Medicare payment it received.

14. Under IPPS, Medicare payments for hospital operating costs are not based directly on the costs actually incurred by a particular hospital. Rather—in order to incentivize hospitals to reduce costs—they receive a fixed payment for each patient they treat and subsequently discharge, based on predetermined, nationally applicable rates subject to certain payment adjustments. 42 U.S.C. § 1395ww(d)(1)-(5); 42 C.F.R. Part 412.

**C.     How IPPS Payments Are Calculated**

15. The fundamental building block for IPPS payments is the base payment rate referred to as the "standardized amount," which roughly represents the national average cost of a typical inpatient course of treatment. Stated simply, IPPS payments are calculated by multiplying the standardized amount by a certain weighting factor reflecting the relative cost of treatment associated with a certain type of diagnosis (known as a diagnosis-related group or "DRG) and other factors. 42 U.S.C. § 1395ww(d)(1)-(2). Although the final amount of a given IPPS payment depends on a variety of factors, the applicable standardized amount is always the starting point.

16. Before each FFY, the Secretary sets the IPPS standardized amount and payment rates through notice-and-comment rulemaking published in the Federal Register. *See* 42 U.S.C. § 1395ww(e)(4)-(5). The Secretary does not recalculate the standardized amount from scratch each year. "Instead, following Congress's directive, [the Secretary] calculated the standardized amount for a base year [FFY 1984] and has since carried that figure forward, updating it annually for inflation." *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011); *see also* 42 U.S.C. § 1395ww(d).

**D.    Statutory Requirements for Calculating the Inaugural IPPS Standardized Amounts**

17.    The Medicare Act provisions creating IPPS required the Secretary to follow a specific eight-step process for calculating the inaugural IPPS standardized amounts and payment rates. *See* 42 U.S.C. § 1395ww(d)(2)(A)-(H); *see also St. Mary's*, No. 1:23-cv-1594-RCL, 2024 WL 5186641, at *2-3 (D.D.C. Dec. 20, 2024) ("*St. Mary's I*").

18.    <u>Step 1</u> required the Secretary to "determine the allowable operating costs *per discharge* of inpatient hospital services for [each] hospital for the most recent cost reporting period for which data are available." *Id.* § 1395ww(d)(2)(A) (emphasis added). This required "costs per discharge" figure served as the foundational component of the inaugural IPPS standardized amounts and payment rates.

19.    <u>Step 2</u> required the Secretary to update the Step 1 "costs per discharge" figures for inflation from the base year (*i.e.*, the "most recent cost reporting period for which data are available") to FFY 1984. *Id.* § 1395ww(d)(2)(B).

20.    <u>Step 3</u> required the Secretary to "standardize" the updated amounts to remove the effect of certain variations among hospitals (*e.g.*, indirect medical education costs, average wage levels, and case mixes). *Id.* § 1395ww(d)(2)(C).

21.    <u>Step 4</u> required the Secretary to group these figures to compute separate average standardized amounts for urban and rural categories for each of nine regions of the country. *Id.* § 1395ww(d)(2)(D).[2]

---

[2] Starting in FFY 1995, IPPS used only a single standardized amount as the starting point for IPPS payments to all providers.

22.     Step 5 required the Secretary to apply percentage adjustments to these average standardized amounts to account for certain issues, *e.g.*, a reduction of the standardized amounts to fund estimated additional payments for high-cost outlier cases. *Id.* § 1395ww(d)(2)(E).

23.     Step 6 required the Secretary to adjust the standardized amounts as necessary to implement the statute's budget neutrality requirement applicable to FFY 1984—*i.e.*, that aggregate reimbursements under IPPS for FFY 1984 would be no greater or less than the aggregate payments that would have been made under the prior reasonable cost system. *Id.* §§ 1395ww(d)(2)(F), 1395ww(e)(1)(B).[3]

24.     Step 7 called for the Secretary to compute DRG-specific rates for urban and rural hospitals in the United States and each region. *Id.* § 1395ww(d)(2)(G).

25.     Step 8, finally, required the Secretary to adjust for different wage levels, *id.* § 1395ww(d)(2)(H), resulting in the IPPS payment rates for FFY 1984.

**E.     The Secretary Invalidly Calculated the Inaugural IPPS Standardized Amounts by Failing to Account for Patient *Transfers* When Calculating the Required "Costs per *Discharge*" Figure, and He Has Never Corrected His Error**

26.     The Secretary acknowledged that the Medicare Act required a specific, multi-step process for calculating the inaugural IPPS standardized amounts. In his Interim Final Rule implementing IPPS, the Secretary stated: "The methodology for arriving at the appropriate [prospective] rate structure is essentially prescribed in the Act in section 1886(d)(2) [42 U.S.C. § 1395ww(d)(2)]. It requires that certain base period cost data be developed and modified in

---

[3] The statute also required the Secretary to make a similar budget neutrality adjustment when establishing the FFY 1985 payment rates, but these budget neutrality requirements applied only for FFY 1984 and FFY 1985. 42 U.S.C. § 1395ww(e)(1)(B); *see also St. Mary's I*, 2024 WL 5186641, at *3 ("For fiscal years after 1985, the process would again start with the prior years' average standardized amounts, but as already discussed, the budget neutrality adjustments were halted after the first two years of the new compensation model.").

several specified ways (*i.e.*, inflated, standardized, grouped, and adjusted)," resulting in the standardized amounts. FFY 1984 IPPS Interim Final Rule, 48 Fed. Reg. 39,752, 39,763 (Sept. 1, 1983).

27.    Yet in an error that the Secretary to this day has never purported to correct, the Secretary invalidly calculated the average "costs per discharge" figure required by the non-discretionary Step 1 of the process. The root of the Secretary's error was his failure to account for patient *transfers* in his calculation of "average costs per *discharge*." This error caused the resulting IPPS standardized amounts and payments to be understated in FFY 1984 and every FFY thereafter, because the Secretary calculates standardized amounts for each new FFY by updating and applying one or more percentage adjustments to the prior FFY's standardized amount(s).

28.    As stated above, Step 1 of the standardized amount calculation required the Secretary to calculate the "allowable operating costs *per discharge* of inpatient hospital services for . . . the most recent cost reporting period for which data are available," which was 1981. 42 U.S.C. § 1395ww(d)(2)(A) (emphasis added); *see also* 48 Fed. Reg. at 39,763-64. When the Secretary calculated the "costs per discharge," he violated the clear statutory requirement by failing to remove or adjust for patients included in the 1981 base-year data that were not *discharged* from hospital care but instead were *transferred* to another hospital for further care. 48 Fed. Reg. at 39,763-64. Thus, for rate-setting purposes, the Secretary effectively treated *transfers* as if they were *discharges*; and instead of calculating the average costs per discharge as required by statute, the Secretary improperly calculated the average costs per discharge *or transfer*.

29.    In implementing IPPS, the Secretary acknowledged that discharges are distinct from transfers. He defined a "discharge" as a "formal[] release[] from the hospital" and expressly excluded from that definition transfer "cases where a patient is transferred to another hospital paid

under the prospective payment system." *See id*. at 39,759. Yet the Secretary did not eliminate the "transfers" he distinguished by rule from his calculation of the "costs *per discharge*" figure required by statute. This error caused the standardized amounts to be understated because the average cost for a patient transferred to another hospital for more care was lower than the average cost a hospital would have incurred if it kept the patient from admission until final discharge from hospital care. *See St. Mary's I*, 2024 WL 5186641, at *7 ("The[] claim that the Secretary lumped discharges and transfers together is uncontroverted. 49 Fed. Reg. 234, 245–46 (Jan. 3, 1984). Straightforward arithmetic dictates that this decision would be expected to yield a reduction in the inaugural standardized amounts."). Thus, the standardized amounts as calculated by the Secretary did not accurately reflect the average cost of a typical full course of hospital treatment.

30.    Not only did this rate-setting methodology fail to calculate the "allowable operating *costs per discharge*" as the statute required, 42 U.S.C. § 1395ww(d)(2)(A) (emphasis added), it also directly conflicted with the clear distinction between transfers and discharges that the Secretary implemented for *payment* purposes under IPPS. *See* FFY 1984 IPPS Interim Final Rule, 48 Fed. Reg. at 39,759. For IPPS, the Secretary implemented a payment policy by which hospitals generally would be paid less for transferred patients than for discharged patients because of the lower costs hospitals incurred on transfer cases. *Id.* In justifying this transfer payment policy, the Secretary stated: "The transferring hospital, generally providing a limited amount of treatment to the transferred patient, is not entitled to payment at the full prospective rate." *Id.*

31.    The Secretary did not rationally explain this inconsistent treatment of transfers for rate-setting and payment purposes. The Secretary did not address the treatment of transfer data at all in the FFY 1984 IPPS Interim Final Rule. In the FFY 1984 IPPS Final Rule, the Secretary acknowledged that under IPPS, a "transfer between two hospitals, each of which is subject to the

15

prospective payment system, will not be considered a discharge for the transferring hospital." 49 Fed. Reg. 234, 245-46 (Jan. 3, 1984). He further acknowledged that the data he used to calculate the costs-per-discharge figure included transfer cases. *Id.* But the Secretary refused to correct for this contradiction, stating that "no data were presented to indicate the actual effect, if any, that this difference between the definitions of discharges under the old and new payment system might have on the DRG rates," and asserting—without any supporting data or analysis—that he "would expect any discrepancy between the 'old' and 'new' definitions of discharge to have no significant effect on the rates." *Id.*

32.     Effectively acknowledging his error, the Secretary correctly reversed course on his treatment of transfers when he implemented the prospective payment system for *capital* costs ("Capital PPS") in FFY 1992. Capital PPS payments are based on a standardized amount reflecting the average *capital* costs per discharge, just as the IPPS standardized amount is meant to reflect the average *operating* costs per discharge. In his Proposed Rule for Capital PPS, the Secretary stated his intention to include transfers in the "costs per discharge" calculation for the Capital PPS standardized amounts, just as he had done when implementing IPPS. FFY 1992 Capital PPS Proposed Rule, 56 Fed. Reg. 8,476, 8,481, 8,487 (Feb. 28, 1991). But unlike with IPPS, in the Capital PPS Final Rule, the Secretary reconsidered that position and acknowledged that counting transfers as discharges was improper and would cause an understatement of the standardized amounts. FFY 1992 Capital PPS Final Rule, 56 Fed. Reg. 43,358, 43,383, 43,386-87 (Aug. 30, 1991). The Secretary therefore applied a "correction factor" that removed the effect of transfer cases in the data, which *increased* the costs-per-discharge figure and the resulting Capital PPS standardized amount by 0.9 percent. *Id.* at 43,361, 43,368.

33.     The logic underlying the Secretary's decision to adjust for transfers in the Capital PPS rates also applied directly to IPPS. Yet despite having knowledge of his error in FFY 1984 and acknowledging the need to adjust for transfers in FFY 1992, the Secretary never purported to adjust the IPPS standardized amount to correct for his improper inclusion of transfer cases in his calculation of the inaugural IPPS standardized amounts. And because those original standardized amounts are carried forward into future IPPS standardized amounts, the Secretary's original error has perpetuated chronic underpayments to the Hospitals and all other IPPS providers to this day.

**F.     The Incorrectly Low FFY 1984 Standardized Amounts, and the Secretary's Failure to Correct His Original Error, Detrimentally Affected IPPS Payments in FFY 2025 and FFY 2026**

34.     The original understatement of average costs per discharge affected not only the FFY 1984 standardized amounts; standardized amounts for all subsequent FFYs also were understated. This is because the Secretary calculates the IPPS standardized amount(s) for a given FFY by adjusting the standardized amount(s) from the previous FFY, tracing back to the original FFY 1984 standardized amounts. *See* 42 U.S.C. § 1395ww(d)(3)(A)-(C).

35.     As the D.C. Circuit explained in *Saint Francis Medical Center v. Azar*:

Prospective payment amounts are determined annually, under a statutory formula that depends in part on base rates known as "standardized amounts." *See* 42 U.S.C. § 1395ww(d)(2)(C). In turn, the standardized amounts depend in part on the "allowable operating costs per discharge of inpatient hospital services." *See id*. § 1395ww(d)(2)(A). Although prospective payment amounts are adjusted over time in various ways, the standardized amounts themselves are not. *See id*. § 1395ww(d)(3). Those amounts were calculated in 1983, based on hospitals' cost-reporting data from 1981. *See* Prospective Payments for Medicare Inpatient Hospital Services, 48 Fed. Reg. 39,752, 39,763-67 (Sept. 1, 1983). *To this day, therefore, Medicare payments for inpatient services depend in part on factual determinations derived from 1981 data and embedded in 1983 calculations, including the calculation of "allowable operating costs per discharge."*

17

894 F.3d 290, 291 (D.C. Cir. 2018) (emphasis added). Thus, the Secretary "calculates hospitals' Medicare reimbursements by employing a formula predicated on statistics for hospital discharges in 1981." *Id*. at 297 (Kavanaugh, J, concurring).

36.    When promulgating the IPPS Final Rules for FFY 2025 and FFY 2026, the Secretary knew that (1) the original FFY 1984 standardized amounts had been improperly calculated without excluding or applying any adjustment for the impact of transfers and (2) the standardized amounts for FFY 2025 and FFY 2026 were based on the original FFY 1984 standardized amounts. In the IPPS Final Rule for both FFYs, the Secretary acknowledged that the standardized amounts determined for the upcoming FFY were based on the previous standardized amounts going back to FFY 1984. *See* FFY 2025 IPPS Final Rule, 89 Fed. Reg. 68,986, 69,940 (Aug. 28, 2024) ("In general, the national standardized amount is based on per discharge averages of adjusted hospital costs from a base period (section 1886(d)(2)(A) of the Act), updated and otherwise adjusted in accordance with the provisions of section 1886(d) of the Act."); FFY 2026 IPPS Final Rule, 90 Fed. Reg. 36,536, 37,213 (Aug. 4, 2025) (same). The Secretary also received comments to his proposed rules for both FFYs—and for proposed rules for prior FFYs—that specifically identified the error in establishing the inaugural FFY 1984 standardized amounts and requested that the Secretary make an adjustment to correct for the ongoing effect of his original error. Finally, the Secretary also knew these facts, of course, because in *Saint Francis* (discussed below) he had litigated a case against many of these same Hospitals that involved the same calculation error in the FFY 1984 standardized amounts.

37.    Despite his knowledge of the material error in the original FFY 1984 standardized amounts, which cascaded forward each year, the Secretary did nothing to correct for the impact of

18

that error when setting the standardized amounts in the IPPS Final Rules for FFY 2025 and FFY 2026, causing underpayments to the Hospitals in those periods.

**G.      The Medicare Appeals Process and Expedited Judicial Review**

38.      The Medicare Act allows a provider that is dissatisfied with a "final determination" as to the amount of its IPPS payments for an open FFY to appeal to the PRRB if the provider meets the requirements in 42 U.S.C. § 1395oo(a), including that the "amount in controversy is $10,000 or more," and "such provider files a request for a hearing within . . . 180 days after notice of the Secretary's final determination." 42 U.S.C. § 1395oo(a)(1)(A)(ii), (2), (3). The publication of IPPS rates in the Federal Register, including the standardized amount(s), constitutes a "final determination" that may be appealed to the PRRB under 42 U.S.C. § 1395oo(a). *Battle Creek Health Sys. v. Kennedy*, 151 F.4th 464, 469 (D.C. Cir. 2025). A group of providers may bring such an appeal if the matter in controversy involves a common question of fact or interpretation of law or regulations and the amount in controversy is, in the aggregate, $50,000 or more. 42 U.S.C. § 1395oo(b).

39.      Although the PRRB has broad jurisdiction to consider providers' challenges to IPPS payment determinations, it lacks the authority to adjudicate the validity of the Secretary's regulations and CMS Rulings. 42 C.F.R. § 405.1867. Thus, when a provider's appeal satisfies the jurisdictional requirements for a PRRB hearing, the provider may request that the PRRB determine whether it has the authority to decide the question of law or regulations relevant to the appeal. 42 U.S.C. § 1395oo(f)(l). If the PRRB determines that the legal issues raised are outside the scope of its authority, it must certify the appeal for "expedited judicial review" or "EJR." *Id*. In that event, the provider has exhausted its administrative remedies, the Secretary's payment determination is final, and the provider may commence a civil action for judicial review of the final payment determination of the Secretary. *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842.

40. In any of the foregoing court actions, and here, the Secretary is the proper defendant. *See* 42 C.F.R. § 405.1877(a)(1). Under 42 U.S.C. § 1395oo(f)(2), interest is to be awarded in favor of a hospital that prevails in an action brought under 42 U.S.C. § 1395oo(f). In addition, under 42 U.S.C. § 1395g(d), CMS is required to pay interest on underpayments to Medicare providers, if the underpayment is not paid within thirty days of a "final determination."

## STATEMENT OF FACTS SPECIFIC TO THESE HOSPITALS

**A.    The Hospitals' Decades-Long Effort to Obtain Judicial Review**

41. As the D.C. Circuit noted in *Saint Francis*, many of the Hospitals have "pursued this issue in various appeals to the PRRB filed as early as 2005." 894 F.3d at 293.

42. Leading up to 2013, the Secretary took the position that hospitals could not challenge their Medicare reimbursements for open cost years based on alleged errors in "predicate facts"—factual determinations that affect the challenged payments for open costs years but were made in prior, closed cost years. *See id.* The D.C. Circuit rejected this position in *Kaiser Foundation Hospital v. Sebelius*, holding that Medicare regulations permit "modification of predicate facts in closed years provided the change will only impact the total reimbursement determination in open years." 708 F.3d 226, 232-33 (D.C. Cir. 2013).

43. In response to *Kaiser*, the Secretary revised 42 C.F.R. § 405.1885, the regulation governing requests for the "reopening" of a payment decision (the "2013 Reopening Revision"), in an attempt to foreclose the correction of predicate facts more than three years after those facts were established or first used. 78 Fed. Reg. 74,826, 75,162 (Dec. 10, 2013) (final rule). Based on the 2013 Reopening Revision, the PRRB dismissed appeals filed by many of these Hospitals challenging the same issue for earlier fiscal years. *See Saint Francis*, 894 F.3d at 293. In 2018, the D.C. Circuit reversed the dismissals, holding in *Saint Francis* that the 2013 Reopening Revision applied only to administrative reopenings, not to PRRB appeals like the ones brought in that case

and by the Hospitals here. *Id.* at 297. Thus, *Saint Francis* and *Kaiser* confirm that the Hospitals are permitted to seek correction of erroneous facts from a closed cost year to ensure that their properly appealed FFY 2025 and FFY 2026 IPPS payments are correct.

44. Nearly five years after *Saint Francis*, the PRRB asserted a new jurisdictional hurdle to these claims. In April 2023, the PRRB issued a decision dismissing five group appeals—one brought by the LifePoint Hospitals—asserting for the first time that 42 U.S.C. § 1395ww(d)(7) and related provisions (the "Budget Neutrality Preclusion Provisions" or "Preclusion Provisions") strip administrative and judicial review of claims challenging the Secretary's failure to remove or adjust for transfers in his inaugural standardized amount calculation. *See St Mary's I*, 2024 WL 5186641, at *5. On appeal, this Court rejected the PRRB's position and held that the Budget Neutrality Preclusion Provisions do not apply to appeals raising this issue. The Court explained that "[a] plain textual reading of the Preclusion Provisions does not evince congressional intent to immunize the Secretary's cost-per-discharge calculation from judicial or administrative review." *Id.* at *11. The Court further held that this "challenge to the inaugural standardized amounts is not inextricably intertwined with the unreviewable budget neutrality adjustments." *Id.* at *12–17. The Court therefore held that the Board "has subject matter jurisdiction over the plaintiffs' challenge," and providers "may seek administrative and judicial review of their predicate fact challenge to the Secretary's inaugural IPPS standardized amount calculation." *Id.* at *17, 19.

**B.    Administrative Procedural Background for These PRRB Appeals**

45. This action arises from two PRRB Common Issue Related Party Group Appeals: PRRB Case Nos. 25-1782GC and 26-0941GC (collectively, the "Group Appeals"). The Group Appeals challenge the Hospitals' respective IPPS payments for FFY 2025 or FFY 2026, as applicable, on the grounds that those payments are improperly understated because of the Secretary's failure to adjust the standardized amount to correct for the errors he made in calculating

21

the inaugural standardized amounts. In each of the Group Appeals, the Hospitals satisfied all jurisdictional requirements set forth in 42 U.S.C. § 1395oo(a)-(b); *e.g.*, the Hospitals timely appealed the applicable IPPS Final Rule,[4] and the amount in controversy far exceeded the $50,000 minimum threshold.

46.     On December 30, 2025—shortly after this Court's opinion in *St. Mary's I* became final and non-appealable—the Hospitals requested EJR in the Group Appeals. In those requests, the Hospitals established that EJR was required because the PRRB had jurisdiction over the Group Appeals but lacked the authority to decide the legal issue under appeal or to grant the relief requested by the Hospitals.

47.     On January 29, 2026, the PRRB issued an EJR Determination granting the Hospitals' requests for EJR. Exhibit 1. In the majority opinion joined by three of four participating Board members, the PRRB found, *inter alia*, that "[i]t has jurisdiction over the challenges to the calculation of the standardized amounts used in the federal rates for the IPPS during FFY 1984 as it allegedly impacts the [Hospitals'] FFY 2025 and 2026 IPPS rates and that the [Hospitals] in these group appeals are entitled to a hearing before the Board," but that "[i]t lacks the authority to decide the legal question of whether the [Hospitals'] FFY 2025 and FFY 2026 IPPS rates are understated because transfers were erroneously included in the calculation of the standardized amounts used in federal rates for the IPPS during FFY 1984." *Id.* at 18-19. Accordingly, the PRRB "conclude[d] that the question of whether the [Hospitals'] FFY 2025 and 2026 IPPS rates are understated falls within the provisions of 42 U.S.C. § 1395oo(f)(1) and in accordance with 42

---

[4] FFY 2025 IPPS Final Rule, 89 Fed. Reg. 68,986, (Aug. 28, 2024); FFY 2026 IPPS Final Rule, 90 Fed. Reg. 36,536 (Aug. 4, 2025).

C.F.R. §405.1842(f)(1), and hereby grants the [Hospitals'] request for EJR for the issue and the subject years." *Id.* at 19.

48.    As permitted by 42 U.S.C. § 1395oo(f)(1), the Hospitals now file this civil action within 60 days of the PRRB's EJR Determination.

## THE ADMINISTRATIVE PROCEDURE ACT

49.    Under 42 U.S.C. § 1395oo(f)(1), review of a final decision of the Secretary "shall be tried pursuant to the applicable provisions under chapter 7 of title 5" of the U.S. Code, which contains the APA, 5 U.S.C. § 551, *et seq*.

50.    Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence. . . ." *Id.* § 706(2).

51.    In *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Supreme Court overturned the doctrine of *Chevron* deference and voiced a full-throated reaffirmation of the traditional role of federal courts in reviewing agency action. Chief Justice Roberts described the proper scope of review under the APA:

> The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment. It specifies that courts, not agencies, will decide "*all* relevant questions of law" arising on review of agency action, §706 (emphasis added)—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it. And it prescribes no deferential standard for courts to employ in answering those legal questions.

*Id.* at 392.

52.    The Secretary's final determinations of the standardized amounts for FFY 2025 and FFY 2026 are unlawful and should be set aside for at least the reasons set forth below.

<u>**COUNT I**</u>
**Judicial Review Under the Medicare Act and the APA**
**(Secretary's Actions Are Contrary to Statutory Law Under the Medicare Act)**

53. The Hospitals hereby incorporate by reference all preceding paragraphs of this Complaint.

54. Agencies may not act "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or otherwise "not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

55. The Secretary's actions adopting flawed standardized amounts for FFY 2025 and FFY 2026, without correcting for his failure to follow the statutory directive to calculate average "costs per discharge" for the original FFY 1984 standardized amounts, are contrary to the Medicare Act. Accordingly, the Secretary's resulting FFY 2025 and FFY 2026 IPPS payment determinations relating to the Hospitals must be recalculated because they violate the plain meaning of the statute. The Medicare Act unambiguously imposed a non-discretionary requirement that the Secretary calculate the original standardized amounts for FFY 1984 based on the "allowable operating costs per discharge of inpatient hospital services." 42 U.S.C. § 1395ww(d)(2)(A). The Secretary violated this clear directive by calculating the average costs per discharge *or transfer* instead of the required "costs per discharge" figure.

56. Treating transfers as discharges when calculating the average costs per discharge and standardized amounts in the initial IPPS rulemaking, effective for FFY 1984 IPPS payments, also violated the clear purpose of the Medicare IPPS statute. Congress intended IPPS payments to be determined by multiplying a figure representing the average cost of a full course of hospital treatment (*i.e.*, the standardized amount) by factors reflecting the relative costliness of a given patient. But because the Secretary miscalculated the average cost of a typical course of treatment, the IPPS payment formula was—and continues to be—inherently skewed downward.

24

**COUNT II**
**Judicial Review Under the Medicare Act and the APA**
**(Secretary's Actions Are Contrary to Statutory Law Because the Secretary Failed to Observe Required Procedure Under the APA and the Medicare Act)**

57.     The Hospitals hereby incorporate by reference all preceding paragraphs of this Complaint.

58.     The Secretary's actions adopting and perpetuating a flawed standardized amount, without following or correcting for his failure to follow the statutory directive to calculate average "costs per discharge" for the original FFY 1984 standardized amounts, are contrary to law because the Secretary failed to comply with applicable procedural rulemaking requirements in the APA and the Medicare Act in many ways, including by failing to explain adequately the decisions not to correct for the understated standardized amounts.

59.     In FFY 1984, the Secretary failed to provide any satisfactory explanation for his inconsistent treatment of transfers for rate-setting versus payment purposes. He did not address the treatment of transfers in his Interim Final Rule. And in his Final Rule, the Secretary's assumption that "any discrepancy" caused by treating transfers as if they were discharges would not have a "significant effect on the rates," 49 Fed. Reg. at 246, was not supported by any data or analysis, and it was belied by the Secretary's adoption of a policy to pay less for transfer cases.

60.     The Secretary further acknowledged at the time he implemented Capital PPS that counting transfers as discharges for purposes of calculating the average costs-per-discharge figure was "problematic" and would result in an understatement of the resulting standardized amount. *See* 56 Fed. Reg. at 43,368. Yet that is exactly what the Secretary did when he calculated the inaugural standardized amounts for IPPS, and he has not yet corrected for that error despite repeated opportunities and requests to do so.

25

61. When promulgating the FFY 2025 and FFY 2026 IPPS Final Rules, the Secretary knew that (a) the original FFY 1984 standardized amounts had been improperly calculated without excluding or otherwise adjusting for the impact of transfers and (b) the standardized amounts for FFY 2025 and FFY 2026 were based on the original FFY 1984 standardized amounts.

62. Despite knowledge of the material error in the original FFY 1984 standardized amounts, which cascaded forward each year, the Secretary did nothing to correct for the impact of that error when setting the standardized amounts in the FFY 2025 or FFY 2026 IPPS Final Rules. Nor did he reasonably explain his failure to correct for the error. Thus, the Secretary's rulemakings setting the standardized amounts for FFY 2025 and FFY 2026 were contrary to law and procedurally invalid because, among other matters, the Secretary failed to adequately explain his actions or point to any data or analysis to support his approach.

**<u>COUNT III</u>**
**Judicial Review Under the Medicare Act and the APA**
**(Secretary's Actions Are Arbitrary, Capricious, an Abuse of Discretion, Not in Accordance with Law, and Unsupported by Substantial Evidence in Violation of the APA and the Medicare Act)**

63. The Hospitals hereby incorporate by reference all preceding paragraphs of this Complaint.

64. The APA requires a reviewing court to hold unlawful and set aside agency action, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E).

65. The Secretary's actions adopting flawed standardized amounts for FFY 2025 and FFY 2026, without correcting for his failure to follow the statutory directive to calculate average "costs per discharge" for the original FFY 1984 standardized amounts, are arbitrary, capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence.

66.    The Secretary acted arbitrarily in calculating the inaugural standardized amounts because his failure to remove or adjust for transfers in the costs-per-discharge calculation was contrary to statute and ran counter to the evidence before him. The Secretary further acted arbitrarily in treating transfers as if they were discharges for rate-setting purposes but treating transfers differently from discharges for payment purposes, which caused the Secretary to undercompensate IPPS providers on the whole.

67.    The Secretary also failed to rationally explain this inconsistent treatment. The explanation that he did offer—that conflating transfers and discharges for rate-setting purposes would not have a significant effect on payments—was belied by his own rationale for his policy to pay transfers less (on average) than full discharges. The Secretary's conclusory explanation was further exposed by his decision to apply a "correction factor" to the inaugural Capital PPS standardized amount to eliminate the effect of transfer data in the costs-per-discharge analysis under that parallel portion of the Medicare Act. The Secretary also failed to consider relevant factors, data, and alternative methodologies in establishing the inaugural IPPS standardized amounts, and he failed to demonstrate a reasonable connection between the standardized amounts and the factors and data he did consider.

68.    The Secretary also acted in a manner that was arbitrary and capricious, an abuse of his discretion, not in accordance with law, and unsupported by substantial evidence when—despite knowledge of the material error in the original FFY 1984 standardized amounts, which cascaded forward each year—he did nothing to correct for the impact of that error when setting the standardized amounts for FFY 2025 or FFY 2026. As then-Judge (now Justice) Kavanagh explained in his concurring opinion in *Saint Francis*, "it would seem to be the very definition of

27

arbitrary and capricious for HHS to knowingly use false facts when calculating hospital reimbursements." 894 F.3d at 298 (Kavanaugh, J., concurring).

## COUNT IV
### Mandamus
### (The Hospitals' IPPS Payments Are Unlawful and Must be Corrected)

69. The Hospitals hereby incorporate by reference all preceding paragraphs of this Complaint.

70. Under 28 U.S.C. § 1361, federal district courts have "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

71. The Secretary has the non-discretionary duty to apply properly the substantive and procedural laws relating to Medicare payment, including, *inter alia*, to reimburse the Hospitals fully in the amounts to which they are entitled under the law. The Secretary violated this non-discretionary duty by setting the FFY 2025 and FFY 2026 standardized amounts without correcting for the understatement caused by his original failure to follow the clear statutory directive to calculate the average costs per discharge in calculating the original IPPS standardized amounts.

72. The Hospitals are entitled to a writ of mandamus under 28 U.S.C. § 1361 directing the Secretary to recalculate the Hospitals' FFY 2025 and FFY 2026 IPPS payments after correcting for the effect of the Secretary's failure to exclude or adjust for transfers in calculating the average costs per discharge in his calculation of the original IPPS standardized amounts.

## COUNT V
### All Writs Act

73. The Hospitals hereby incorporate by reference all preceding paragraphs of this Complaint.

74.     The Secretary violated the Medicare Act and APA by failing to correct underlying errors in the FFY 1984 standardized amount calculation and by unlawfully calculating the Hospitals' IPPS payments for FFY 2025 and FFY 2026. Under the All Writs Act and other authority, the Hospitals are entitled to an order requiring the Secretary to make proper IPPS payments to the Hospitals and to pay appropriate interest on the underpayments. *See* 28 U.S.C. § 1651; 42 U.S.C. §§ 1395oo(f)(2), 1395g(d), 1395l(j); 42 C.F.R. § 405.378.

## **REQUEST FOR RELIEF**

WHEREFORE, the Hospitals request:

a.     An order declaring that the FFY 2025 and FFY 2026 standardized amounts were improperly understated and the Hospitals are entitled to receive for FFY 2025 and FFY 2026 the additional Medicare IPPS payments to which they would have been entitled if the Secretary had not acted unlawfully;

b.     An order remanding this action back to the Secretary to (a) remove the effect of the FFY 1984 predicate fact error and determine the proper standardized amount for FFY 2025 and FFY 2026, and (b) calculate the amounts owed to the Hospitals and to make prompt payment of any additional amounts due, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2) and/or 42 U.S.C. § 1395g(d);

c.     In the alternative, issuance of a writ of mandamus directing the Secretary to recalculate the Hospitals' FFY 2025 and FFY 2026 IPPS payments after correcting for the effect of the Secretary's failure to exclude or adjust for transfers in calculating the average costs per discharge in his calculation of the original standardized amounts, plus interest.

d.     Costs of suit incurred by the Hospitals, including reasonable attorneys' fees; and

e.     Such other relief as the Court may deem just and proper.

29

Dated February 9, 2026

Respectfully submitted,


 */s/ Stephen A. Calhoun*　　　　　　　
Stephen A. Calhoun
 (D.D.C. Bar # TX047)
Edgar C. Morrison, Jr.
 (D.D.C. Bar # TX0166)
JACKSON WALKER L.L.P.
1900 Broadway St., Ste. 1200
San Antonio, Texas 78215
Tel: (210) 978-7780
Fax: (210) 242-4619
jmorrison@jw.com
scalhoun@jw.com

*Counsel for Plaintiffs*

30